FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 0 7 2006
1:03 p.m.
Stephan Harris, Clerk
Cheyenne

## United States District Court
## for the District of Wyoming

| | |
|---|---|
| BRAD SKINNER, on his own behalf, and on behalf of all other persons similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT LAMPERT, Director of the Wyoming Department of Corrections, and SCOTT ABBOTT, Warden of the Wyoming State Penitentiary, in their official capacities, <br><br> Defendants. | Case No. 02-cv-033-B |

## Order Denying Defendants' Motion to Terminate, Modifying Prospective Relief, and Granting in Part and Denying in Part Plaintiffs' Six Contempt Motions

The Wyoming State Penitentiary has operated under the supervision of this Court since October of 2003 because of unconstitutional conditions of confinement that failed to reasonably protect inmates from inmate-on-inmate violence. See Skinner v. Uphoff, 234 F. Supp. 2d 1208 (D. Wyo. 2002). The Defendants now seek to end this Court's supervision, claiming there are no current and ongoing violations of any federal right. The Plaintiffs oppose termination and have filed six contempt motions

for various violations of this Court's final decree.

## *BACKGROUND*

This class-action Eighth Amendment "failure to protect" case arose out of a challenge to the conditions of confinement at the Wyoming State Penitentiary in Rawlins. Plaintiff Brad Skinner, who had been severely beaten by other inmates even after seeking protection from prison guards, brought the action on his own behalf and on behalf of current and future inmates. Plaintiff Skinner claimed that the Penitentiary's administrators, who were the predecessors of the current Defendants, and a number of individual prison guards failed to reasonably protect him individually -- and state prisoners as a class -- from inmate-on-inmate violence.

The administrators admitted that they had not recorded the number of inmate assaults occurring at the Penitentiary between 1996 and 2002. Id. at 1214, n.1. They also admitted that, despite their own policies, they had neither systematically investigated inmate assaults nor addressed their causes. Id. On the three occasions they saw fit to investigate, the defendant-administrators took no remedial or disciplinary action even though institutional deficiencies and staff misconduct contributed to the assaults. Id. For these reasons and others, this Court found that conditions at

2

the Penitentiary violated the inmates' Eighth Amendment right to be reasonably protected from physical violence in the form of assaults by other inmates.  Id. at 1216.  The unconstitutional conditions were the result of three undisputed failures by the defendant-administrators: (1) failure to adequately train and supervise staff in how to investigate and abate dangerous conditions, (2) failure to develop an effective internal review process for the reporting of policy violations committed by staff, and (3) failure to discipline malfeasant staff.  Id. at 1214-16.

The Court ordered the parties to develop a remedial plan to eliminate these violations.  The parties agreed to significant portions of a remedial plan, but the negotiations eventually stalled.  The Defendants then submitted a proposed remedial plan that incorporated provisions the parties agreed upon and provisions the parties could not agree upon.  After reviewing the proposed plan and the Plaintiffs' objections, the Court entered a final decree incorporating the Defendants' second proposed remedial plan with certain modifications (the "Remedial Plan") on October 7, 2003.  (See Final Decree Adopting and Incorporating Defs.' Second Proposed Remedial Plan, with Modifications, and Granting in Part and Denying in Part Pl.'s Objections to the Plan.)

3

During the next two years, the Court and the Plaintiffs monitored the Penitentiary's efforts to eliminate the unconstitutional conditions. During that time, this Court ordered the Defendants to share certain information about inmate assault investigations with the Plaintiffs and their counsel and established rules for protecting confidential information. Skinner v. Uphoff, 410 F. Supp. 2d 1104 (D. Wyo. 2006) (second order on various motions); Skinner v. Uphoff, No. 02-CV-033-B (D. Wyo. Sept. 27, 2005) (order on various motions).

On January 3, 2006, the Defendants filed their motion to terminate the final decree and all related prospective relief. As required by the Prison Litigation Reform Act, 18 U.S.C. § 3626, the Remedial Plan was stayed as of March 29, 2006. Id. at § 3626(e). The Plaintiffs opposed the motion and filed six contempt motions on May 5, 2006. After extensive discovery, the parties filed numerous exhibits to support their respective motions, and the Court heard oral argument on June 1, 2006.

## DEFENDANTS' MOTION TO TERMINATE

### I. Termination of the Remedial Plan is controlled by the Prison Litigation Reform Act, 18 U.S.C. § 3626.

Prison-reform decrees arising from any civil action with respect to prison conditions, like the Remedial Plan in this case,

4

are governed by the Prison Litigation Reform Act, 18 U.S.C. § 3626 (the PRLA or the Act). The PLRA "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions." Miller v. French, 530 U.S. 327, 331 (2000).

## A. Limitations upon Prospective Relief

The purpose of the PLRA is to limit the power of a federal court to grant prospective relief in prison-conditions litigation. See, e.g., Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 655 (1st Cir. 1997) (citing 141 Cong. Rec. 14,418-19 (1995)). To this end, prospective relief, which is defined as "all relief other than compensatory monetary damages," 18 U.S.C. § 3626(g)(7), "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." Id. § 3626(a)(1)(A). A federal district "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." Id.

## B. Termination of Prospective Relief

5

Historically, prison-reform decrees remained in force for significant periods of time, see, e.g., Inmates of Suffolk County Jail, 129 F.3d 649 (more than twenty years); Guajardo v. Texas Dep't of Criminal Justice, 363 F.3d 392 (5th Cir. 2004) (twenty years), so the PLRA defines standards for termination of prospective relief.   See 18 U.S.C. § 3626(b) (termination standards).   First, all prison-reform decrees become terminable after a certain period of time:

> [prospective] relief shall be terminable upon the motion of any party or intervener (i) 2 years after the date the court granted or approved the prospective relief under this paragraph; (ii) 1 year after the date the court has entered an order denying termination of prospective relief ...; or (iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act [April 26, 1996], 2 years after such date of enactment.

Id. § 3626(b)(1)(A).   Alternatively,

> a defendant or intervener shall be entitled to the *immediate* termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

Id. § 3626(b)(2) (emphasis added).   Together, these sections identify a set of cases that are eligible for termination. Berwanger v. Cottey, 178 F.3d 834, 838 (7th Cir. 1999) (describing

6

"essential decision" in termination cases).

In this case, the Remedial Plan was approved by this Court on October 7, 2003, so any party could move for termination after October 7, 2005. The Defendants filed their motion on January 3, 2006, so the Remedial Plan is terminable.

**C.   Continuation of Otherwise Terminable Prospective Relief**

Upon a timely motion to terminate or a finding that prospective relief was granted without the required findings, prospective relief shall terminate unless the district court makes the following written findings based upon the record:   (1) prospective relief remains necessary to correct a current and ongoing violation of a federal right; (2) prospective relief extends no further than necessary to correct the violation of a federal right; and (3) prospective relief is narrowly drawn and the least intrusive means to correct the violation. 18 U.S.C. § 3626(b)(3).   This is the standard for the termination decision currently before the Court.

The threshold question is whether there are any current and ongoing violations of a federal right at the Penitentiary.   If there are, then the question becomes whether the Remedial Plan is necessary to correct the violations, is narrowly drawn, and is the

7

least intrusive means to correct the violations.   The burden is

upon the Plaintiffs to prevent termination of the Remedial Plan.

Laaman v. Warden, N.H. State Prison, 238 F.3d 14, 20 (1st Cir.

2001); Guajardo, 363 F.3d at 395-96 (per curiam); Hallett v.

Morgan, 296 F.3d 732, 741-45 (9th Cir. 2002).

## D.   Interpretations of Section 3626(b)

There is almost no Tenth Circuit law regarding section 3626(b)

motions to terminate, so the most significant rulings come from

other circuits.   Three considerations are important.   First, a

"current and ongoing violation of a Federal right" is one that is

occurring at the time of the section 3626(b) inquiry, so potential

future violations are insufficient to support continued prospective

relief.   Inmates of Suffolk County Jail, 129 F.3d at 662; Para-

Professional Law Clinic, SCI-Graterford v. Beard, 334 F.3d 301 (3rd

Cir. 2003); Castillo v. Cameron County, Tex., 238 F.3d 339, 353

(5th Cir. 2001); Cason v. Seckinger, 231 F.3d 777, 784 (11th Cir.

2000).   Second, violation of the specific terms of a prison-reform

decree does not necessarily equal a violation of a "Federal right"

under section 3626.   Plyler v. Moore, 100 F.3d 365, 370 (4th Cir.

1996) ("we conclude that the term 'Federal right' as used in §

3626(b)(2) does not include rights conferred by consent decrees

8

providing relief greater than that required by federal law"). In this case, the federal right previously violated by the administrator-defendants was the inmates' Eighth Amendment right to reasonable protection, and the Plaintiffs do not argue there is any other federal right being violated. Therefore, given the first two considerations, the Plaintiffs must show that this right is currently being violated to defeat the Defendants' motion to terminate. Finally, if the Court finds a current and ongoing violation of a federal right, "it must make written findings on the record about whether the prospective relief aimed at that violation remains necessary to correct it." Cason, 231 F.3d at 784. The Court's findings should not be conclusory; rather,

> the district court should engage in a specific, provision-by-provision examination of the ... decree[], measuring each requirement against the statutory criteria. The court must determine, and enter findings about, whether each requirement extends no further than necessary to correct a current and ongoing violation of a federal right, is narrowly drawn, and is the least intrusive means of correcting that violation.

Id. at 785.

## E. Evidentiary Hearings and Section 3626(b)

The fact-intensive analysis required by section 3626(b) will often require an evidentiary hearing, which may be granted at a district court's discretion. A hearing may also be required if the

9

parties, especially the inmate-plaintiffs, request one. See Id. at 782-83 (evidentiary hearing is required where plaintiffs have alleged current and ongoing violations of their federal rights) and Loyd v. Alabama Dep't of Corrections, 176 F.3d 1336 (11th Cir. 1999) (same), but compare Berwanger, 178 F.3d at 840 (a new hearing is only needed if the requesting party offers evidence showing disputed issues of material fact) and Guajardo, 363 F.3d at 397 (per curiam) (same). In unpublished opinions, the Tenth Circuit has endorsed an evidentiary hearing in a prison-conditions case where defendants sought to terminate injunctions established before the PRLA, but that hearing was to be limited to the issues in the parties' filings so plaintiffs were not allowed to expand the litigation to other issues. Battle v. Fields, No. 95-7164, No. 96-7013, slip op. at 6-7 (10th Cir. March 29, 1996), readopted and reaffirmed in slip. op. at 3 (10th Cir. November 7, 1996) (applying PRLA standards) (unpublished decisions).

A hearing is not required in this case for two reasons. First, neither party has requested one. Second, there has been significant discovery, as evidenced by the voluminous exhibits filed by the parties to support their various motions, since the Defendants filed their motion to terminate in January of 2006. The

10

practical question is whether this Court can make the necessary findings from the documents filed by the parties. After reviewing the exhibits and considering the parties' preferences, the Court finds that it can make the necessary findings and an evidentiary hearing is therefore not required.

## II. The Court finds current and ongoing violations of the Plaintiffs' constitutional right to reasonable protection at the Wyoming State Penitentiary.

The Remedial Plan must be terminated unless there is a current and ongoing violation of the Plaintiffs' federal rights, specifically their Eighth Amendment right to reasonable protection from inmate assaults. It is a close question, and the Defendants have made significant progress in addressing the unconstitutional conditions at the Penitentiary, but the Court finds there remain current and ongoing violations of Plaintiffs' Eighth Amendment right to reasonable protection. The **Defendants' Motion for Termination of Final Decree and Prospective Relief** is **DENIED**.

### A. The Eighth Amendment Right to Reasonable Protection

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). Prison officials have the duties of providing humane

11

conditions of confinement and ensuring adequate food, clothing, shelter, and medical care, as well as taking "reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984). Specifically,

> prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners. Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

Farmer v. Brennan, 511 U.S. 825, 833-34 (1994) (internal quotation marks and citations omitted).

## B. Legal Standard for Violations of the Eighth Amendment

The test for a violation of the Eighth Amendment contains both objective and subjective components. See id. at 834. The objective component requires inmates to show that they are "incarcerated under conditions posing a substantial risk of serious harm." Id. This includes "official conduct that is 'sure or very likely to cause' serious injury at the hands of other inmates."

12

Benefield v. McDowall, 241 F.3d 1267, 1272 (10th Cir. 2001) (quoting Helling, 509 U.S. at 33). As applied to inmate violence, officials create a substantial risk of serious harm and satisfy the objective component when they fail to reasonably investigate suspected assaults or fail to abate any institutional failures or staff misconduct that unreasonably contributes to these assaults. Skinner, 234 F. Supp. 2d at 1214-15. Where prison officials allow a "code of silence" to insulate them from accurate information about institutional failures or staff misconduct, the risk of serious harm is even greater. See id. at 1215-16.

Although conditions posing a substantial risk of serious harm are necessary, they are not sufficient to find an Eighth Amendment violation because inmates must also show that prison officials had the culpable state of mind known as "deliberate indifference." Farmer, 511 U.S. at 834. This is the subjective component of an Eighth Amendment violation.   Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." Id. at 836.   It exists when an official "knows of and disregards an excessive risk to inmate health or safety." Id. at 837. Knowledge by a prison official may be demonstrated by circumstantial evidence, and "a factfinder may

13

conclude that a prison official knew of a substantial risk from the very fact that it was obvious." Id. at 842. Furthermore, an inmate "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. Deliberate indifference may exist if "the evidence show[s] that [prison officials] . . . refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." Id. at 842 n.8.

## C. Current Conditions at the Penitentiary -- Significant Improvements since 2003

Before discussing the conditions that cause this Court to find current and ongoing violations of the Eighth Amendment, it is important to give credit to the Defendants and the State for the significant improvements they have made. Prior to this litigation, there were no records kept regarding the number of inmate assaults, and only three investigations of inmate assaults occurred between 1996 and 2002. Although staff conduct was discovered to be a contributing factor in these assaults, no disciplinary actions were taken. Today, after three years of court supervision, the situation is significantly better. The Defendants have created an

14

Investigations Unit within the Department of Corrections.  This unit, which is led by the Investigations Major, investigates potential inmate assaults whenever there is an appearance of injury.  Since 2003, there have been 153 investigations, each of which resulted in a written report.  The investigations indicate that there were 89 assaults since October of 2003.  Thirteen assaults were determined to be premeditated, which triggered an outside investigation under the Remedial Plan.  Only two assaults caused serious injuries to inmates that required overnight hospital stays.  The Penitentiary failed to keep records prior to 2003, so it is impossible to say if the current level of violence is higher or lower than it was in the past.  Regardless, the Defendants' increased attention to inmate assaults is obvious and laudable.

Significantly, the Defendants are not just investigating assaults; they are taking action upon what they learn.  The Defendants have taken 159 staff disciplinary actions against 125 different employees as a result of the assault investigations.  The Defendants have also improved their staff training and now provide comprehensive training to all employees on the Penitentiary's inmate safety policies and requirements.  The Penitentiary's staff are becoming professionals, which will inevitably improve the

15

status of Wyoming prison guards and the conditions of confinement imposed upon prisoners. The Defendants' accomplishments are all the more impressive given the challenges they face recruiting people for difficult jobs that are not highly paid in a local economy characterized by a "tight" labor market.

The new-found attention to inmate assaults is at least in part a result of the new management personnel at the Department of Corrections -- about one-half of the old management has left since 2002 -- and the commitment of the current Defendants to improving the Penitentiary. This Court is genuinely glad to see such improvements at the Penitentiary, and nothing in this order is meant to minimize the importance of this progress. Good work is good work, even when more work remains to be done.

**D. Current and Ongoing Violations of the Eighth Amendment**

With due consideration of the significant improvements made by the Defendants and this Court's statutory duty to not exercise its supervisory authority one minute more than necessary, this Court nonetheless finds that current and ongoing violations of the Eighth Amendment exist at the Penitentiary. The Court would be shirking its moral and constitutional duty to the inmates incarcerated at the Penitentiary to find otherwise.

16

1.  **Failure to Adequately Investigate and Abate Dangerous Conditions -- the Penitentiary's Inmate Conflict Documentation System**

The primary problem in the past was the lack of attention to inmate assaults -- assaults that were neither counted nor investigated.  Even when there was an investigation, nothing was done to abate any dangerous conditions discovered.  The Defendants are now tracking and investigating inmate assaults at the Penitentiary; however, the Court finds the Defendants' response to known failures of its inmate conflict documentation system has been inadequate.  Given the Penitentiary's historical inattention to inmate assaults, the Defendants' inadequate response violates the Eighth Amendment.

Personal conflicts between inmates, which can arise prior to or during incarceration, are one source of inmate assaults. (See Collins Dep. 121:19 - 122:12, March 7-8, 2006 (joint expert); see also Pls.' Depo. Exhibit Volume 1 Exh. 124 (Warden's Memorandum #8 re: Documentation of Inmate Conflicts, February 19, 2004).)  A functioning conflict documentation system is therefore essential to the reasonable protection from inmate assaults.  The Penitentiary has a conflict documentation system, the Wyoming Corrections Information System (WCIS), that attempts to record and investigate

17

inmate-reported conflicts and then document verified conflicts to prevent placement of inmates with conflicts in proximity to each other, especially in the housing units. (See Def. Lampert Depo. 118:7-16, March 14, 2006.) There is no constitutional requirement that a prison's conflict documentation system be perfect, and the Penitentiary's system is not. For example, a premeditated assault resulted in part because a lieutenant admittedly failed to check the conflict documentation system before moving an inmate into a housing unit. (Def. Lampert Depo. 117:21 - 118:21; Pls.' Depo. Exhibit Volume 1 Exh. 67.)

A more disturbing example is the case of Inmate Roe. (See Pls.' Fifth Contempt Motion: Defs.' Failure to Timely Remedy a Dangerous Condition 4-10; Defs.' Resp. to Pls.' Br. in Opposition to Mot. for Term. of Final Decree and Six Mots. for Contempt Exh. L; Abbott Depo. 258:1 - 268:11; Pls.' Depo. Exhibit Volume 1 Exh. 92, 124.) During his initial processing into the Penitentiary in August of 2004, Inmate Roe declared a pre-existing conflict with another inmate, Inmate Doe. On October 18, 2004, prison staff noted the conflict and decided that Roe was not to be housed in the same unit as Doe. (See Pls.' Depo. Exhibit Volume 1 Exh. 92.) Thirteen days later, on October 31st, this conflict was entered

18

into the Penitentiary's conflict database. (Abbott Depo. 263: 21-22.) Unfortunately, on October 21st or 22nd, Roe had been assigned to Doe's cell despite the declared and acknowledged conflict. (Defs.' Resp. to Pls.' Br. in Opposition to Mot. for Term. of Final Decree and Six Mots. for Contempt Exh. L.) Despite entry of the conflict into WCIS, Roe remained in Doe's cell for approximately eight months until Doe was transferred to Texas, which appears to have been in May of 2005. (Id.; Thayer-Steele Depo. 38:7-22, March 29, 2006.) During this time, Doe allegedly beat and sexually assaulted Roe multiple times. (Id.) Roe allegedly told several staff members that he had a conflict with his cellmate, but he did not report the assaults for fear of retribution until Doe was transferred. (Defs.' Resp. to Pls.' Br. in Opposition to Mot. for Term. of Final Decree and Six Mots. for Contempt Exh. L.) No conclusion has been made as to the veracity of Roe's assault allegations, but it is not disputed that he should not have been placed in the same cell as Doe because of the declared and verified conflict. The investigation is still in process, but the conflict was missed in part because of a delay in entering it into the WCIS. (Abbott Depo. 263:21-23.)

Because of the failure of the Penitentiary's conflict

documentation system in Roe's case, the system was changed. (Id. 264:6-17.) Despite the changes, the Penitentiary once again moved an inmate on Roe's conflict list into Roe's housing unit in 2005. (Id. at 264:18-21.) Fortunately, it does not appear that this resulted in an assault. It is a serious problem, however, because the Defendants have not done enough to determine how this second mistake happened. Although Defendant Abbott has known of this incident since October or November of 2005 and although he suspects staff malfeasance, he has only referred the issue to the Investigations Unit. (Id. at 265:9 - 267:19.) He has taken no steps to investigate the matter himself even though he admits that failures in the conflict documentation system can be fatal (id. at 264:14-17), even though he is not certain the Investigations Unit is in fact investigating the second error (id. at 264:25 - 265:3), and even though he is expected to conduct an immediate investigation to address immediate management issues under Policy 1.012 and the Remedial Plan. As a result, several months after the current conflict documentation policy failed due to possible "staff malfeasance," Defendant Abbott still is not certain how the system failed or whose misconduct resulted in the housing of an inmate on Roe's conflict list in his unit.

20

The Court finds the repeated failures of the Penitentiary's conflict documentation system to be an immediate concern, and Defendant Abbott's delayed and inadequate investigation of these failures created a substantial risk of serious harm.[1]  The Court further finds that Defendant Abbott acted with deliberate indifference because he knew about the existence of flaws in the design or implementation of the Penitentiary's conflict documentation system for at least five months and did almost nothing to uncover the flaws or any staff misconduct. His decision to refer the matter to the Investigations Unit and then wait months for a resolution was unreasonable given the immediate security concerns raised by the repeated failures of the system. Defendant Abbott's continuing failure to adequately investigate the failures in the Penitentiary's conflict documentation system is therefore a current and ongoing violation of the Plaintiffs' Eighth Amendment right to reasonable protection.

The Defendants' failure to perform an immediate inquiry into the second failure of the conflict documentation system is

---

[1] In doing so, the Court makes no findings regarding the validity of Inmate Roe's assault allegations against Inmate Doe. Whether or not Roe was actually assaulted, the failure of the conflict documentation system created a substantial risk of serious harm.

21

especially worrisome considering the Penitentiary's historic indifference to inmate assaults.  This example suggests that the Defendants believe formalistic adherence to the Remedial Plan by merely referring all inmate assault issues to the Investigations Unit without considering the need for immediate, independent action is sufficient to protect inmates' federal rights; it is not.  This seems especially true in the first case where an inmate's assault allegations may be difficult to verify even though the cause of the prison's failure may not be difficult to find, and in the second case where no assault is reported even though an unreasonable risk of an assault was created by the prison's failure.  In cases where strict adherence to the procedures laid out in the Penitentiary's policies (or the Remedial Plan) is inadequate to address an immediate security concern, the Defendants must act to reasonably protect inmates -- merely dotting the i's and crossing the t's of Penitentiary policy or the Remedial Plan does not satisfy the Constitution.

> **2.  Failure to Implement an Effective Internal Review Process for the Reporting of Staff Error, Staff Misconduct, and Institutional Deficiencies that Cause or Contribute to Inmate Assaults ("Code of Silence")**

One   of   this   Court's   primary   concerns   has   been   the

22

Penitentiary's historic failure to implement an effective internal review process prior to this lawsuit. The result of this failure was a culture of silence -- sometimes referred to as a "code of silence" -- that prevented administrators from ostensibly knowing much of what was happening at the Penitentiary. Various requirements of the Remedial Plan, especially the Certification Requirement, were designed to break the silence and give the Defendants the information they needed to reasonably protect the inmates in their care.

The Certification Requirement specifically requires prison staff to report "any mistake or misconduct by an employee ... or any institutional deficiency [that] may have caused or contributed to [an assault] incident." (Defs.' Second Proposed Remedial Plan 6-7 (adopted by Court on October 23, 2006).) Given the Penitentiary's historic silence about inmate assaults, inclusion of the Certification Requirement in its incident reporting forms was necessary for implementation of an effective internal review process because it required staff to inform administrators of potentially dangerous conduct, policies, or conditions. It simultaneously communicated to prison staff the importance of reporting mistakes, misconduct, and institutional deficiencies and

23

thereby directly confronted the culture of silence at the Penitentiary. Although there is evidence suggesting the requirement has been difficult to implement, the Defendants have made efforts to train staff to comply with it.

That said, the Defendants have fatally undermined the effectiveness of the Certification Requirement by narrowly interpreting "institutional deficiency." Specifically, both Defendant Lampert and Defendant Abbott interpret "institutional deficiency" to exclude any policy or practice that has been previously investigated and determined to be acceptable by a supervisory member of the administration; therefore, if an employee has previously reported a perceived deficiency, orally or otherwise, and has been told by a supervisor that the policy does not create a deficiency, then that employee is not required to report the perceived deficiency in subsequent incident reports even if he or she believes the policy in fact contributed to an inmate assault. (See Abbott Depo. 15:10 - 18:4; Lampert Depo. 32:5-9, 34:1 - 37:4; see also Pls.' Depo. Exhibit Volume Exh. 108 (Joint Expert's Preliminary Comments, May 13, 2005).) Defendant Abbott put it this way:

    If the officer has addressed [a bad policy that contributed to an assault] before with his supervisory

24

staff or has previously had it reviewed[, and] it has
been found that [it] is the way the institution wishes to
operate, I don't believe there would be a requirement [to
report the officer's opinion that the policy contributed
to an assault].

(Abbott Depo. 15:25 - 16:4.)   The result favors the status quo:
once a policy or procedure has been investigated, prison staff are
now no longer required to report when they believe that policy or
procedure contributed to or caused an inmate assault.   And the
silence returns.

The Defendants' interpretation creates a substantial risk of
harm because the Defendants will not know when their own employees,
who are on the front-lines at the Penitentiary, have reason to
believe that an inmate assault is the result of a settled policy or
procedure.   How else are the Defendants to know when their
understanding of the effects of prison policies and procedures is
no longer valid?   How else are they to know when a mistake has been
made in the evaluation of a prison policy or procedure?   The
Defendants' interpretation of "institutional deficiency" encourages
a business-as-usual mentality, which is a close cousin to the see-
no-evil-hear-no-evil mentality that existed prior to 2002.   Because
of the historic culture of silence about inmate assaults at the
Penitentiary, the Defendants' desire to systematically filter out

25

new, contradictory information about settled policies and procedures is especially dangerous. It limits the knowledge of administrators and that sends the wrong message to staff.

The policy is also more dangerous at the Penitentiary because of the significant changes in management, staff, physical plant, and policy that have occurred and continue to occur. Filtering information about settled policies prevents new managers from identifying potential problems created by previous decisions, and thereby inhibits the ability of new thinking to affect the Penitentiary's operations. Moreover, the message to new staff is not to question settled policies. This threatens to reproduce the culture of silence. For these reasons, the Court also finds the danger created by the Defendants' interpretation of "institutional deficiency" to be obvious, so the Defendants' interpretation demonstrates deliberate indifference.

## III. The Court finds the provisions of the Remedial Plan meet the need-narrowness-intrusiveness requirements of the PRLA.

The Court has found that two continuing and ongoing violations of the inmates' federal right to reasonable protection from inmate assaults: (1) the Defendants' refusal to adequately respond to the immediate concerns raised by the repeated failure of their conflict documentation system; and (2) the Defendants' interpretation of

26

"institutional deficiency" in the Certification Requirement such
that evidence of problems resulting from settled policies and
procedures is systematically filtered out.   The first violation
results from the Defendants' failure to adequately investigate and
abate dangerous conditions; the second from the Defendants' failure
to implement an effective internal review process to uncover staff
error or misconduct and institutional deficiencies.   Having found
current violations, the question becomes whether the Remedial Plan
is necessary to correct the violations, is narrowly drawn, and is
the least intrusive means to correct the violations -- the so-
called "need-narrowness-intrusiveness" requirement of the PRLA.
Benjamin v. Fraser, 343 F.3d 35, 52 (2nd Cir. 2003);   Cason, 231
F.3d at 784.  A majority of the Remedial Plan's provisions remain
necessary, narrowly tailored, and the least intrusive means to
correct the current violations: these provisions and the related
policies and orders shall remain in force.   Certain provisions
regarding outside investigations and staff discipline are no longer
necessary and are terminated.

## A.   Investigations

### 1.   Investigation Requirement

The Remedial Plan requires the Penitentiary to investigate all

27

suspected incidents of inmate physical altercations or assaults. The initial investigation is to be performed by the Investigations Unit under the command of the Investigations Major. Every assault that is not found to be a "spontaneous fight" is to be investigated by an outside investigator.

The internal investigation requirement remains necessary to cure the Defendants' failures to adequately investigate and abate dangerous conditions and to cure the Defendants' failure to implement an effective internal review process. As Defendants admitted at oral argument in this matter, the internal investigations are the best way to uncover dangerous conditions, staff error or misconduct, and institutional deficiencies. The Court further finds that the internal investigations requirement is narrowly tailored and the least intrusive means for remedying the current violations.

Regarding the outside investigation requirement for premeditated assaults, the Court finds this requirement is no longer necessary to correct the current violations at the Penitentiary. The Investigations Unit and the Plaintiffs' ability to review appropriately redacted written reports provides a sufficient check upon the possibility of biased investigations

28

within the Penitentiary. Also, the distinction between premeditated assaults and spontaneous fights does not matter in light of the current violations, which are more a function of the Defendants' conduct towards investigations and security concerns in general. Finally, given the current violations, the outside investigations are unnecessarily intrusive and therefore cannot be imposed under the PRLA. The outside investigation requirements of the Remedial Plan are therefore terminated.

## 2. Incident Report Forms and the Certification Requirement

Besides requiring investigations, the Remedial Plan requires prison staff to report "any mistake or misconduct by an employee ... or any institutional deficiency [that] may have caused or contributed to [an assault] incident." (Defs.' Second Proposed Remedial Plan 6-7 (adopted by Court on October 23, 2006).) This is the Certification Requirement. For the reasons discussed above, when the Court found that the Defendants' interpretation of "institutional deficiency" was a current and ongoing violation of a federal right, the Court finds this requirement remains necessary to address the culture of silence at the Penitentiary. The Court further finds that the Certification Requirement is narrowly tailored to address the culture of silence problem and is the least

29

intrusive means to do so.

### 3.  Staff Discipline

The Court has found there is no current and ongoing failure to discipline staff at the Penitentiary, so there is no justification for imposition of any duties that go above and beyond the State of Wyoming's existing disciplinary process.  Any such duties imposed by the Remedial Plan are therefore terminated.

However, the Court finds that provisions for limited dissemination of information concerning staff discipline related to incidents of inmate harm through the General Incident Tracking Log remains necessary to correct the current and ongoing violations because this information relates to the actions taken by the Defendants to abate dangerous conditions.  The provisions and orders making this necessary information available to the Plaintiffs and the Joint Expert, including the limits placed upon use and availability of this information, are narrowly tailored and the least intrusive means to correct the current and ongoing violations.  The provisions for dissemination of this kind of information in the Remedial Plan and this Court's other orders therefore remain in force.

### B.  Institutional Culture

The Remedial Plan required the Defendants to assess the culture at the Penitentiary, educate staff on the rights of inmates and the Penitentiary's policies and procedures for inmate protection, and educate inmates on their rights to be reasonably safe from harm by other inmates. The Defendants completed a cultural assessment, so this requirement has been satisfied. The Court finds the education of staff and inmates remains necessary to remedy the current and ongoing violations because it promotes the conscientious reporting and investigation of inmate assaults and promotes the prompt abatement of dangerous conditions. The Court further finds these requirements to be narrowly tailored and the least intrusive means to remedy the current and ongoing violations.

## C. Compliance -- The Joint Expert

The Remedial Plan provided for a joint expert, William Collins, to report on the progress of the Defendants at regular intervals. The Court finds the Joint Expert provided necessary information for the evaluation of the Defendants' compliance with the Constitution and this Court's orders. The Joint Expert's oversight may be intrusive, but it is nonetheless the least intrusive means to acquire objective information to evaluate the conditions of confinement at the Penitentiary. The powers granted

31

to and responsibilities imposed upon the Joint Expert in the Remedial Plan remain in force. The parties and the Joint Expert are **ORDERED** to negotiate a schedule for inspection and reporting that allows the Joint Expert to produce one report during the remainder of 2006 and two reports each year thereafter. This schedule shall be filed with the Court **no later than September 1, 2006.**

## D.    Incorporated Policies and Procedures

The Remedial Plan incorporated various Penitentiary policies and State of Wyoming procedures. To the extent these policies and procedures apply to provisions that remain in force, they continue to be incorporated in the Remedial Plan as modified by this order. First, they are necessary to correct the current and ongoing violations because the related provisions are necessary. Second, since they are the policies and procedures of the Penitentiary, the Department of Corrections, and the State of Wyoming, they are found to be narrowly tailored and the least intrusive means to correct the current and ongoing violations.

## E.    Supplemental Orders

The Court has issued supplemental orders to resolve particular issues that arose in the implementation of the Remedial Plan. See

32

Skinner, 410 F. Supp. 2d 1104 (second order on various motions);
Skinner, No. 02-CV-033-B (D. Wyo. Sept. 27, 2005) (order on various
motions). To the extent these orders apply to provisions that
remain in force, they continue to remain in force because they are
necessary, narrowly tailored, and the least intrusive means to
correct the current and ongoing violations.

## *PLAINTIFFS' SIX CONTEMPT MOTIONS*

In response to the Defendants' motion to terminate the
Remedial Plan, the Plaintiffs filed six contempt motions for
specific violations of the Remedial Plan. These violations were
also part of their argument that the Defendants are currently
violating inmates' federal right to reasonable protection from
inmate assaults. The Court has already made its findings regarding
the current and ongoing violations of federal rights at the
Penitentiary, so it will evaluate the Plaintiffs' contempt motions
only as violations of a court order.

Civil contempt is one method a district court may use to
enforce its orders. Hutto v. Finney, 437 U.S. 678, 6901 (1978).

In a civil contempt proceeding, the proof of contempt
must be clear and convincing. To make a prima facie
showing of contempt, however, the [plaintiff] need prove
only that the defendant has failed to comply with a valid
court order. It need not prove that the defendant is able
to comply. ... [T]he defendant [then bears] a burden of

33

production. This burden is normally satisfied when the
defendant produces sufficient evidence of his inability
to comply to raise a question of fact. The burden of
persuasion remains on the [plaintiff], but what may be
required to sustain the burden varies according to the
evidence produced by the defendant. Initially, the
[plaintiff] need persuade the court only that the
defendant has failed to comply with a valid court order.
Once the defendant has produced detailed evidence
regarding his inability to comply with the order, the
[plaintiff] has the additional burden of persuading the
court that the defendant actually is able to comply.

Heinold Hog Market, Inc. v. McCoy, 700 F.2d 611, 615 (10th Cir.
1983) (quoting United States v. Rylander, 656 F.2d 1313, 1318 (9th
Cir. 1981)).

## I.   Plaintiffs' First Contempt Motion

Plaintiffs allege Defendants deliberately failed to comply
with the Remedial Plan's two-tiered investigation process, which
requires an initial internal investigation of every assault and
then an outside investigation if the assault is found to be
premeditated, in two specific instances. In the first instance,
Defendant Lampert sent the investigation of a large-scale fight
involving 20 inmates to an outside investigator without first doing
an internal investigation. Defendants respond that the
Investigations Major was present during the fight so his
investigatory ability was compromised, and the fight was definitely
premeditated so it was going to be sent to an outside investigator

34

anyway. In the second instance, Defendant Lampert refused to refer the investigation of an assault upon an inmate (Incident No. 01.05.0193) by two purported gang members even though the internal investigation indicated the assault was premeditated. Defendants respond that the inmate-victim refused to cooperate because of his safety concerns, so the investigation was halted.

The Court finds that the Defendants failed to comply with the investigation requirements of the Remedial Plan in the first instance. The Court further finds that compliance was possible in the first instance because the internal investigation could have been completed by another internal investigator even if the Investigation Major's presence at the fight made it impossible for him to conduct the investigation. Therefore, the Court finds the Defendants in contempt for their failure to complete an internal investigation, and **Plaintiffs' First Contempt Motion** is **GRANTED IN PART** as to the first instance. However, the Court imposes no fine or penalty because an investigation was in fact completed.

In the second instance, the Court finds that Defendants' refusal to refer the second investigation to an outside investigator was not a violation of the Remedial Plan. Even if it were a technical violation, the Court finds that the Defendants

35

could not comply with the outside investigation requirement because the inmate-victim stated he would refuse to cooperate if there were further investigation. **Plaintiffs' First Contempt Motion** is therefore **DENIED IN PART** as to the second instance.

## II.   Plaintiffs' Second Contempt Motion

Plaintiffs allege that Defendants have deliberately failed to implement the Certification Requirement of the Remedial Plan, which seeks to eradicate the "code of silence" by requiring staff to document staff error or misconduct or institutional deficiencies that contributed to each assault. Defendant Lampert's position is that if an officer has already discussed a policy decision with supervisory staff and the officer has been told that the policy is acceptable, then the officer's opinion that the policy contributed to an assault need not be included in the Certification Requirement. Plaintiffs argue this deliberately undermines the requirement. Defendants argue that this prevents re-hashing policy decisions that have been made in the past and avoids constant reconsideration of policies that have been adequately considered and implemented. As discussed above, the Court has found the Defendants' interpretation of the Certification Requirement to be a current and ongoing violation of a federal right requiring

36

continued supervision by this Court. The Court also finds the Defendants' conduct in contempt of court and **Plaintiffs' Second Contempt Motion** is **GRANTED**. No fine or penalty is imposed.

### III. Plaintiffs' Third Contempt Motion

Plaintiffs allege that Defendants have deliberately failed to adequately train staff on the requirements of the Certification Requirement because staff do not know that they are to include their opinions, not just the facts of an incident. Defendants state there was some confusion in the initial training, but these problems have been resolved and all staff are now properly trained on the Certification Requirement. The Court finds that the Defendants' efforts to train staff on the Certification Requirement have adequately complied with the intent of the Remedial Plan. **Plaintiffs' Third Contempt Motion** is **DENIED**.

### IV. Plaintiffs' Fourth Contempt Motion (Request for Injunction)

Plaintiffs allege that the Defendants have consistently failed to respond to safety concerns raised by front-line officers about the staffing levels at the Penitentiary. Specifically, Plaintiffs point to Defendants' failure to respond to two memos sent by officers working in the Housing Unit regarding inadequate staffing and the officers' concerns about the resulting dangers. Plaintiffs

37

admit there is no staffing requirement in the Remedial Plan, but contend that the Defendants' failures to investigate staffing levels that may contribute to assaults violate the spirit, if not the express command, of the Remedial Plan.   If necessary, the Plaintiffs ask the Court to issue an injunction to prevent this dangerous practice.   Defendants assert that they do review staffing complaints by comparison with the most recent staffing studies, but admit they do not reply to every complaint about inadequate staffing.

Staffing is important to the reasonable protection of inmates, but there are no express staffing requirements in the Remedial Plan and the Court finds no grounds to establish such requirements.   The Court further finds that the Defendants' current reliance on their most recent staffing studies does not violate the Remedial Plan and does not violate any federal right.   Likewise, the Defendants' failure to respond to the staff members who raised the concerns does not violate any federal right.   **Plaintiffs' Fourth Contempt Motion** is **DENIED**.

## V.   Plaintiffs' Fifth Contempt Motion

Plaintiffs' Fifth Contempt Motions is based primarily upon the Defendants' failure to respond to the admitted failures of their

38

conflict documentation system in the case of Inmate Roe.    As detailed in section **II.D.1** above, the Court has found the Defendants' failure to be a current and ongoing violation of a federal right justifying this Court's continued supervision of the Penitentiary.    The Court also finds the Defendants in contempt; **Plaintiff's Fifth Contempt Motion** is **GRANTED**.  No fine or penalty is imposed.

## VI.   Plaintiffs' Sixth Contempt Motion

Plaintiffs allege that the Defendants have failed to investigate claims of inadequate staffing in the Penitentiary even though staffing levels have been implicated in several assault investigation reports.  Defendants argue they have adequate and up-to-date staffing studies available and that the Penitentiary consistently operates with adequate staff.    As stated above, staffing is important to the reasonable protection of inmates, but the Court finds that the Defendants' current reliance on their most recent staffing studies does not violate the Remedial Plan and does not violate any federal right.  **Plaintiffs' Sixth Contempt Motion** is **DENIED**.

### *CONCLUSION*

Despite the efforts of the Defendants and Plaintiffs and this

Court, current and ongoing violations of the inmates' right to reasonable protection from inmate assaults continue at the Wyoming State Penitentiary; therefore, this Court retains its supervision under the Remedial Plan as modified by this order. **The automatic stay of the Final Decree is lifted and the Remedial Plan, as modified by this order, is once again in effect.** The Defendants may move for termination again one year after the date of this order. The Court encourages the Defendants to continue their good work and complete the needed changes to the Penitentiary during the coming year so that this Court's supervision of the Penitentiary can end.

Dated this ___7th___ day of August, 2006.

Karene li, Dimmer

UNITED STATES DISTRICT JUDGE

40